DONALD CARMICHAEL & another *vs.* HENRY WOOD'S SONS
COMPANY & another.

Norfolk.    March 12, 1903. — July 7, 1903.

Present: KNOWLTON, C. J., LATHROP, BARKER, & HAMMOND, JJ.

*Covenant.    Deed.    Practice, Civil.*

In this suit in equity to restrain the defendants from injuring the plaintiffs' land by maintaining a dam above the height prescribed by the terms of a certain indenture it was *held* that upon the facts stated in the opinion the covenant sought to be enforced did not apply to the parcel of land owned by the plaintiffs.

BILL IN EQUITY, filed December 13, 1901, by the owners of a certain tract of land in Wellesley, containing about twelve acres, against the Henry Wood's Sons Company and the Waban Rose Conservatories, corporations respectively the lessee and owner of a mill dam at the outlet of Morse's Pond, a great pond

in Wellesley, to restrain the defendants from raising or maintaining the water of Morse's Pond and its outlet above the centre of a certain copper bolt fixed in the masonry of the dam, except for the purposes specified in a covenant contained in a certain indenture, also praying for damages and for further relief.

The plaintiffs derived their title through successive conveyances from one John Jennings, Jr. The title of the Waban Rose Conservatories was derived from Edmund M. Wood. In 1871, when John Jennings, Jr. owned the plaintiffs' land, which Jennings had acquired from the heirs of Daniel Dadmun, and also owned a mill site and certain other parcels of land owned at the filing of the bill by the Waban Rose Conservatories, and when Edmund M. Wood owned a mill and maintained at the outlet of Morse's Pond the mill dam now complained of, Jennings and Wood executed the following indenture, under the terms of which the plaintiffs sought relief:

" This Indenture of the two parts executed in duplicate by and between Edmund M. Wood of Needham and John Jennings, Jr., of Natick, on this twenty-second of November, A. D. one thousand eight hundred and seventy one, Witnesseth : that whereas there have been several matters of controversy between said parties, it is now agreed by and between them, each agreeing in consideration of the agreements of the other, to settle said matters of difference as follows, to wit: First: whereas each of said parties is the owner of a mill and a mill-dam, that of said Wood being in said Needham and that of said Jennings in Natick, and whereas each by his dam aforesaid flows the land of the other, it is hereby agreed as aforesaid by said parties that so far as past damage for flowage is concerned, each party hereby releases to the other his claim therefor. As to future damage it is hereby agreed, that the damage for flowage by one shall offset the damage by flowage by the other, acre for acre, but that if either shall flow more land than the other, the person so flowing an excess shall pay the other yearly as damage therefor, at the rate of four 20/100 dollars per acre, for such excess. Wood's land which is so flowed and to which said agreement applies is a part of the Drury land or farm lying between Oak street in said Natick and the dam known as the old Drury dam as per plan to be made by Austin

Bacon and heretofore flowed by said Jennings. Jennings' land which is flowed, and to which said agreement applies, is land lying in Needham, easterly of Jennings' Mill near the water-works, and was bought of heirs of Daniel Dadman (*sic.*). Second: The line between certain lands of said Wood and said Jennings is in controversy, said lands being near said Jennings' mill. The said parties mutually agree as aforesaid that the line between their said lands as established by Austin Bacon, Esq., of said Natick by his award and determination *hereto annexed* and made part thereof, shall forever be the line between said lands. Third: whereas a brook running through said Wood's land empties into the stream below said Jennings' mill, causes at times back water, it is hereby agreed that said Jennings may within one year, enter upon the land of said Wood and make a new channel for said brook; also a new channel for Stevens Brook to a clump of willows, both as staked, filling up the old channel with the earth taken from the new and spreading the remainder of the earth, if any taken out upon the meadow of said Wood. And that said Jennings may always enter upon said land for the purpose of clearing said brook from collections preventing the flow of the water. Fourth: there has been a controversy between said parties as to the height to which said Wood shall maintain his dam below the dam of said Jennings. It is hereby agreed that the water raised by said dam of said Wood except in case of repairs upon the wheels, *floom* or machinery connected with said dam, shall be maintained in the ordinary state of the stream only to the height of the centre of a copper bolt fixed in the masonry of said Wood's new dam at a point five feet one and one-half inches below the top of the westerly end of the capsill of said new dam, said bolt has been inserted in the masonry of said new dam by said Bacon. Fifth: the injunction heretofore issued on the petition of said Jennings restraining said Wood from further work on his dam, etc., it is agreed is hereby dissolved, and the suit shall be entered neither party. Each of said parties enters into the foregoing agreements with the other his heirs and assigns, for himself his heirs and assigns. In witness whereof the said John Jennings, Jr., and Edmund M. Wood have hereto on the day first above written, set their hands and seals."

The plan and award of Austin Bacon annexed to the indenture are described by the court.

At different stages the case came before several different judges of the Superior Court. On December 19, 1902, that court made the following decree:

"This cause came on to be further heard at this term after the filing of the master's report and was argued by counsel, and thereupon upon consideration thereof it is

"Ordered, adjudged, and decreed that the exceptions of both parties to the master's report be and they hereby are overruled, and that the defendants, Henry Wood's Sons Company and Waban Rose. Conservatories, be and they hereby are enjoined from maintaining the water raised by their mill-dam on the outlet stream of Morse's Pond, in Wellesley, in the county of Norfolk, in the ordinary state of the stream above the centre of the copper bolt fixed in the masonry of said dam at a point five feet one and one-half inches below the westerly end of the cap-sill thereof except in case of repairs upon the wheels, flume, or machinery connected with said dam, and that the plaintiffs recover of the defendant, the Waban Rose Conservatories, damages in the sum of $29.75 with interest from Nov. 22, 1901, and their costs to be taxed by the clerk, and that execution issue therefor."

Both the plaintiffs and the defendants appealed from this decree.

*F. H. Stevens,* (*C. E. Dow* with him,) for the plaintiffs.

*E. R. Thayer,* (*S. R. Wrightington* with him,) for the defendants.

BARKER, J. The plaintiffs seek in equity to enjoin the lessees and the owners of a water mill from flowing certain tillage land, and to recover damages for past flowing. Ordinarily a mill owner who flows such land is liable merely for damages which are recoverable only under the mill acts. But in the year 1871, the predecessors in title of the parties entered into an indenture under seal purporting to bind each party thereto and his heirs and assigns, and the plaintiffs contend that by reason of this indenture the defendants should be enjoined from raising the water above a certain height, and that entertaining the bill for that purpose the court also should award damages for past flowing.

When the indenture was made, Jennings owned not only the twelve acres of land now belonging to the plaintiffs but another smaller parcel adjoining it upon the west and two other still smaller parcels which adjoined each other still farther to the west, constituting his mill site, but separated from the first two parcels by land of Wood. On the most easterly of these parcels Jennings had a dam which raised a narrow mill pond, overflowing other land of Wood. Jennings also had two other parcels of land, one very small, circular in shape, and below his pond and surrounded by the land of Wood which separated Jennings's mill site from his lands which lay to the west of it, the other between his pond and Worcester Street and westerly of and adjoining the parcel of Wood's land flowed by Jennings's pond. Jennings's pond and mill were supplied with water only by a brook which from his mill ran into Morse's pond, which was fed also by other brooks. His mill was a saw and grist mill. The Jennings mill and all of the Jennings land except the twelve acre tract are now owned by one of the defendants.

There was another water mill, used for the manufacture of paints, the dam of which raised and controlled the waters of Morse's pond. This mill was owned by Wood the predecessor in title of the defendant who is now the owner of both mill sites. Wood, as stated, also owned land flowed by Jennings's dam. The water raised by Wood's dam flowed Jennings's first mentioned, or twelve acre, parcel of land to some extent, and besides this Jennings contended that a new dam which Wood was erecting would flow out Jennings's water wheels and interfere with the use of his mill. To prevent this injury to his mill he had brought a bill in equity against Wood, which was pending, and upon which a temporary injunction had been issued which prevented Wood from completing his new dam. The bill had no relation to the flowing of the twelve acre tract.

Jennings in respect of his tillage land could not as of right restrict the height of Wood's dam, but if Jennings's mill had a superior right, as he claimed, he could of right prevent the lower dam from raising water so high as to injure his own mill. Jennings could overflow Wood's land to any extent, and Wood had a similar right to flow any of Jennings's land except his mill privilege.

Besides the controversy dealt with by the equity suit then pending as to the height to which Wood could erect and maintain his new dam without injuring Jennings's mill, and their respective pecuniary claims for compensation for flowing damages, there was also a controversy between them as to a boundary line.

A brook in land of Wood, emptying below Jennings's mill into the brook whose waters supplied that mill, at times caused backwater upon the wheels of Jennings's mill. There does not seem to have been a controversy as to this matter.

Under these circumstances, Jennings and Wood, desiring to settle their controversies, executed the indenture. Since then the ownership of both water privileges and of all the Jennings parcels of land, except the twelve acres, has passed to one of the defendants. The title to the Jennings parcel of twelve acres was bought by the plaintiffs for $300 in 1896, and is held by them.

It was agreed in the indenture that the water raised by Wood's dam, except in case of certain repairs, should be maintained in the ordinary state of the stream only to the height of the centre of a certain copper bolt, and it is conceded that since the plaintiffs have acquired their title the defendants have at times maintained at a greater height water raised by the dam. The plaintiffs contend that the agreement as to the height of water attached to the twelve acres, while the defendants contend that it attached only to the Jennings mill. This is the principal question for decision ; and it must be settled by ascertaining the intention of the parties.

Their principal intention was not to arrange a scheme for the development of tracts of land. It was not to create or confer easements, but to adjust mutual pecuniary demands, fix a boundary line, and prevent the injury of an upper by a lower mill privilege. The only dispute as to the height of Wood's dam was at what height it would work injury to Jennings's mill privilege. There was no controversy as to the height to which Wood could raise water so far as the twelve acre tract was concerned, and nothing to prevent Jennings from raising his own dam and thereby appropriating to himself a right to flow under the mill act more of Wood's land lying above.

The indenture begins with a recital that " whereas there have been several matters of controversy between said parties, it is now agreed by and between them, each agreeing in consideration of the agreements of the other, to settle said matters of difference as follows, to wit"; then follow five clauses headed respectively, " First: " etc., following the last of which is this sentence: " Each of said parties enters into the foregoing agreements with the other his heirs and assigns, for himself his heirs and assigns." Then follows the usual testimonium clause, ending the instrument. The first of the five clauses recites that whereas each party owns a mill and a mill dam and whereas each by his dam flows the land of the other, it is agreed that each party releases to the other his claim for past damages, that as to future damages "the damage for flowage by one shall offset the damage by flowage by the other, acre for acre, but that if either shall flow more land than the other, the person so flowing an excess shall pay the other yearly as damage therefor, at the rate of four 20/100 dollars per acre, for such excess." The clause concludes with two sentences, one of which defines " Wood's land which is so flowed and to which said agreement applies," while the other defines " Jennings's land which is flowed, and to which said agreement applies," and which in fact was merely the twelve acre lot now owned by the plaintiffs.

It is to be noticed that this clause, in which alone the twelve acre parcel is directly mentioned, contains no words which extend the operation of the whole indenture to the matters treated of in this clause. It is not said that "this indenture" applies to the twelve acres, but only that "said agreement applies," namely the agreement as to the rate of compensation per acre for flowing damages and that the damages shall be offset so far as may be and the balance paid yearly. There is nothing in the clause to suggest that either party intended that the right to flow the lands of either should be limited. This controversy as to damages, which they were settling, was only as to flowage by existing mills and from the use of water rights which the parties had already appropriated. Their agreement had no reference to flowage from the use of additional water rights in the future, which the parties might afterwards appropriate, either in connection with the existing mills or with others.

The next clause is this: "Second: The line between certain lands of said Wood and said Jennings is in controversy, said lands being near said Jennings' mill. The said parties mutually agree as aforesaid that the line between their said lands as established by Austin Bacon, Esq., of said Natick by his award and determination *hereto annexed* and made part thereof, shall forever be the line between said lands." No connection existed between this boundary controversy and that as to the height to which Wood might raise water by his dam. It seems to have been dealt with by the indenture because the dispute was as to a boundary of Wood's land flowed by Jennings's dam and because the parties were settling, as they recited in the beginning of the indenture, "several matters of controversy." The presence of such a clause favors the idea that each of the agreements in the indenture was an independent covenant not designed to affect all of the matters treated of in the other clauses, and that the reason for bringing them into one indenture was that each agreement of either party was a consideration for the agreements of the other.

The third clause gave Jennings the right to change and keep open a channel for a brook on Wood's land. There does not appear to have been any controversy existing about this brook, and there was no connection between the subject of the clause and either of the controversies which was settled by the indenture. Apparently it was an independent agreement.

The fourth and fifth clauses are as follows: "Fourth: there has been a controversy between said parties as to the height to which said Wood shall maintain his dam below the dam of said Jennings. It is hereby agreed that the water raised by said dam of said Wood except in case of repairs upon the wheels, *floom* or machinery connected with said dam, shall be maintained in the ordinary state of the stream only to the height of the centre of a copper bolt fixed in the masonry of said Wood's new dam at a point five feet one and one-half inches below the top of the westerly end of the capsill of said new dam, said bolt has been inserted in the masonry of said new dam by said Bacon. Fifth: the injunction heretofore issued on the petition of said Jennings restraining said Wood from further work on his dam, etc., it is agreed is hereby dissolved, and the suit shall be entered neither party."

The natural interpretation of these two clauses is that they deal with only the controversy which had been carried into court as to the height to which water could be raised by the lower dam without injuring the upper mill privilege, and that they merely were meant to compromise that controversy by allowing Wood to complete his new dam as he proposed, but restricting its full use. In respect to the twelve acres Jennings had no right to restrict the height of the lower dam. Part of that tract would be flowed when the water in the lower dam was at the height of the centre of the copper bolt, and more when there should be higher water than in the ordinary state of the stream, and when repairs were being made. The method of adjusting the damages for the flowing of the tract had already been settled and laid down in the first clause of the indenture. Jennings would not be likely to seek to attach to an unimportant tract disconnected with his own mill privilege, an easement to control the operation of Wood's dam; and Wood would be very unlikely to grant a new easement of that character to be attached to such a parcel of land or to extend such a right over his own mill privilege to any land except to the Jennings mill privilege, to which, as it was contended, the right was already attached.

The absence from the first clause of any reference to the restriction imposed by the fourth clause, the separation of the first and fourth clauses by the second and third, relating to other matters, and the fact that the fourth clause begins with a recital which implies that the one of the several controversies to be dealt with in it is " a controversy between said parties as to the height to which said Wood shall maintain his dam below the dam of said Jennings," and the improbability that Jennings would ask or Wood consent to attach to the twelve acres an easement which would limit the use of Wood's dam, in our view, all tend to the conclusion that both parties meant that the agreement stated in the fourth clause should be only for the benefit of the upper mill.

Some weight in the same direction may be given to the facts that in the second clause there is a stipulation that the boundary thereby established " shall forever be the line between said lands," and in the third clause a stipulation that Jennings " may always enter upon said land for the purpose of clearing said

brook," while there is no similar language in the fourth or the first clause. We think that this settlement of flowing damages was made in reference to the then existing conditions and to water rights then in use by the parties, and that as to damages to either party from the appropriation of new rights, by raising a dam or otherwise, the agreement has no application, the parties being left to their rights under the mill act.

Attached to and recorded with the indenture is another document which seems to be twice referred to in the indenture, first in the first clause in the description of Wood's land flowed by Jennings's dam, by the words "as per plan to be made by Austin Bacon," and next in the second clause by the words "as established by Austin Bacon, Esq., of said Natick by his award and determination *hereto annexed.*" The document is a broadside on which are two plans, one entitled " Plan of land flowed by E. M. Woods Mill. Estimated on ground at $2\frac{1}{2}$ acres," the other "A plan of land flowed by John Jennings Mill, belonging to E. M. Wood. Estimated on the ground at 1 acre, 16 rods," and this statement: " These Plans to be used to determine payment by E. M. Wood of a sum of money, as per Agreement between Wood & Jennings Recorded Middlesex Lib 1187 Fol 584. Norfolk Lib 416 Fol 152. Excess per Agreement One Acre 64 Rods. Annual payment of Woods to Jennings Five Dollars & 88/100," which is signed "Austin Bacon," while below his signature are the words "Accepted by" and the signatures bracketed of " John Jennings Jr." and of " Edmund M. Wood." On the plan of " Land flowed by E. M. Woods Mill" is a set of two irregular parallel lines meant to indicate the course of a brook, near which lines are the words " This Brook is the line," and this we take to be the award of Austin Bacon as to the disputed boundary referred to in the second clause as annexed to the indenture. This document is minuted as received for record at Dedham " Dec. 29, 1871," while the indenture is minuted as received at the same registry " Nov. 29, 1871."

We see in this document nothing to support the plaintiffs' contention that the agreement of the fourth clause that except in case of repairs the water raised by Wood's dam shall be maintained in the ordinary state of the stream only to a certain height, was intended to be attached to the twelve acres. We

assume that the plan upon the broadside entitled "A plan of land flowed by John Jennings Mill, belonging to E. M. Wood" is the plan referred to in the first clause as "plan to be made by Austin Bacon," and this and the reference to Austin Bacon's award as to the boundary made it by reference a part of the indenture. As matters then stood, the ordinary flowage by Wood's dam would be fixed by the stage of the water when at the height limited by the fourth clause of the indenture, and it was natural that the parties in settling their controversies as to flowing each other's lands by their dams as they then were should have Bacon make and that they should preserve the data which would enable them to know what annual payment ordinarily must be made by one to the other as matters were then adjusted between them. No support of a limitation upon Wood's right to flow the twelve acre tract can be derived from the contents of the broadside.

From the record of the case we assume that although the evidence was taken and reported by a commissioner under Chancery Rule 35, the cause was also sent to and heard by a special master whose report was filed on October 28, 1902, and that both parties excepted to the report of the special master, and that the exceptions of both parties were overruled by the judge, whereupon each party appealed. In the report of the commissioner it appears that the plaintiffs called a witness, Stevens, who testified "Yes, sir," to a question whether he "ever had a conversation with Edmund M. Wood in regard to the flowage of this land." Thereupon counsel for the plaintiffs stated that Edmund M. Wood was a party to the indenture and was deceased, and that counsel wanted to put in evidence a conversation that the witness had with Wood in regard to the flooding of the land to show the practical interpretation of the covenant. The report does not state the conversation or its substance.

The commissioner's report also shows that one of the plaintiffs, when upon the stand, was asked by his counsel whether he ever had a conversation with Edmund M. Wood, counsel stating that he wanted to show the declaration of one of the parties to the covenant, and that the evidence was excluded. Here again the commissioner's report contains no statement as to what the declaration of Wood to the witness was.

The plaintiffs now contend that Wood had admitted the plaintiffs' right to have the water kept not above the centre of the copper bolt, and that the evidence excluded ought to have been admitted and that it ought to be considered in construing the indenture.

The case as it is before us must be disposed of without regard to the evidence offered and excluded. We cannot know what the declarations of Wood were, and therefore cannot say that they were competent or relevant.

Therefore we are compelled to construe the indenture of 1871 looking to its own language, to the document annexed to it, and to the situation of the parties to it when it was made. So looking at the instrument we are of opinion that the agreement as to the dam then owned by Wood, contained in the fourth clause of the indenture, was not intended by the parties to attach to and did not attach to the twelve acres of land now owned by the plaintiffs.

The result is that the plaintiffs have shown no right to have the height of the water raised by the dam owned by one of the defendants and leased to the other restricted, and that as they have no right to equitable relief by injunction the decree in their favor should be reversed and their bill dismissed by the lower court.

Holding this view, we see no reason why we should discuss the other questions raised by the exceptions of both parties to the master's report, and by their appeals from the final decree, or by the defendants' appeals from the overruling of their demurrers.

*Decree to be entered in the Superior Court reversing final decree for plaintiffs and dismissing the bill with costs.*